**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X
                     :

FIROOZ GHASSABIAN,              :
                     :

             Petitioner,   :

    - against -           :

FATOLLAH HEMATIAN, BEHDAD  :    ECF Case
HEMATIAN, HERTSEL AKHAVAN,  :
and CLASSICOM, L.L.C., a limited  :    Civil Case No. 08-CIV-4400 (SAS)
liability company organized under the :
Laws of the State of Delaware,    :
                     :

           Respondents. :

IN THE MATTER OF THE      :
ARBITRATION BETWEEN     :
                     :

FATOLLAH HEMATIAN, BEHDAD  :
HEMATIAN, HERTSEL AKHAVAN  :
and CLASSICOM L.L.C.,       :
                     :

           Claimants,  :

    v.                 :

FIROOZ GHASSABIAN,        :

           Respondent.  :
                     :
-------------------------------------------------------------- X

## DECLARATION IN SUPPORT OF MOTION TO DISMISS

      HILTON SONIKER, an attorney duly licensed to practice law before the United States district court for the Southern District of New York, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a member of the firm of Kamerman & Soniker P.C., and am counsel to Respondents in this action.

2.    I am familiar with the facts and circumstances of this case and submit this Declaration on the basis of my own personal knowledge and in support of Respondents' Motion to Dismiss.

3.    I certify that, by letter dated June 11, 2008 to Jeffrey E. Michels, I advised Petitioner's counsel of Respondents' intention to file this Motion to Dismiss and the grounds thereon.

4.    By letter of June 12, 2008 from Mr. Michels, Mr. Michels confirmed that the issues presented in this Motion to Dismiss could not be resolved without judicial intervention.

5.    Annexed as Exhibit A is a true and correct copy of Classicom's Operating Agreement dated May 27, 1999 (the "Operating Agreement").

6.    Annexed as Exhibit B is a true and correct copy of an agreement between the Petitioner and the individual Respondents dated May 27, 1999 which sets forth the terms pursuant to which the parties were to commercialize an invention relating to a wrist mounted telephone device (the "Enterprise Agreement").

7.    Annexed as Exhibit C is a true and correct copy of Petitioner's Petition.

8.    Annexed as Exhibit D is a true and correct copy of the docket sheet printed from the Court's Internet site.

9.    Annexed as Exhibit E is a true and correct copy of the Affidavit of Service of the Demand for Arbitration upon Petitioner.

10.    Annexed as Exhibit F is a true and correct copy of the Demand for Arbitration served upon Petitioner.

**WHEREFORE,** it is respectfully submitted that the within Motion should be granted in its entirety, together with such other and further relief as this Court deems just, proper and equitable.

Dated:    June 19, 2008
          New York, New York

                                            s/ _____
                                            Hilton Soniker (HS 6097)

3

## Classicom L.L.C.
### OPERATING AGREEMENT

### ARTICLE I   FORMATION

SECTION 1. NAME. The name of the Company is Classicom L.L.C..

SECTION 2. AGREEMENT DATED May 27, 1999. The initial members have entered into an Agreement dated May 27, 1999, (copy attached) which provides for certain aspects of the operation of the Company. That Agreement shall in all respects override any provision which is in conflict with any matter herein.

SECTION 3. BUSINESS. This Company is to be formed to engage in any lawful act, business or activity for which the Company may be formed under the laws of the State of Delaware. The purposes of the Company shall include:

(1) the development, commercialization, manufacture, and marketing of products and services based on the Invention or any improvements, enhancements or additions thereto or modifications or derivations thereof;

(2) the filing, prosecution, holding, licensing and enforcement of patents based on the Invention or any improvements, enhancements or additions thereto or modifications or derivations thereof; and

(3) the performing of other acts reasonably necessary for the profitable exploitation of the Invention or any improvements, enhancements or additions thereto or modifications or derivations thereof.

SECTION 4. TERM. The term of this Company shall be until May 27, 2098.

SECTION 5. PLACE OF BUSINESS. The Company's initial place of business is 11 Locust Cove Lane, Great NY 11024.

### ARTICLE II   MANAGERS

SECTION 1. NUMBER. There shall be four (4) Manager who initially shall be Fatollah Hematian, Firooz Ghassabian, Hertsel Akhavan and Feridoon Ghassabian.. Managers need not be a Member of the Company. There shall always be at least three managers in office at all times.

SECTION 2. ELECTION OF MANAGERS, VACANCIES. The Managers shall be elected at each annual meeting of Members, by vote of a majority of the voting Units, or at a special meeting called for the purpose of electing the Managers, or the Managers may be designated at any time by unanimous written action of the members, always F. H   B. H

subject to the terms of the Agreement dated May 27, 1999, with respect to obligatory votes.

SECTION 3. TERM OF OFFICE; RESIGNATION. The Managers shall hold office until the next annual meeting of the Members, or until his successor is elected, or until such Manager's resignation, removal from office or death. A manager may resign at any time by providing a writing to that effect to the members. Such resignation shall take effect immediately or at such other time as such manager may specify.

SECTION 4. MANAGERS COMPENSATION. The Managers compensation shall be determined by the Members on an annual basis, during the first year following the incorporation of the Company:

SECTION 5. OFFICERS AND OTHER MATTERS. (a) The officers of the Company shall be:

| | |
|---|---|
| President | Firooz Ghassabian |
| Vice President | Fatollah Hematian |
| Secretary | Yoram Ghassabian |
| Assistant Secretary | Hertsal Akhavan |
| Treasurer | Behdad Hematian |

(b) Checks issued by the Company for less than $10,000, shall be signed by the President, signing alone. Any check issued by the Company for $10,000 or more, shall be signed by the President, and countersigned by either the Vice President or the Treasurer.

(c) Firooz Ghassabian shall be Manager of Technical Development commencing June 1, 1999, and continuing for a period of two years, at an annual salary of $96,000 payable in equal monthly installments during the term of employment by the Company. He shall devote his entire time and efforts towards the commercialization of the Invention by the Company, including, the making of improvements, enhancements and additions to and modifications and derivations of the Invention. All improvements, enhancements and additions to and modifications and derivations of the Invention; all other inventions, conceived or reduced to practice during the term of employment of Firooz Ghassabian by the Company and all other inventions related to the foregoing created during the period of one year after the termination of employment, including all proprietary rights therein or based thereon, shall be property of the Inventor, and shall forthwith be transferred by him to the Company, without charge to the Company.

(e) The Company will not pay salaries to Fatollah Hematian, Behdad Hematian and Hertsel Akhavan for any services rendered to the Company during its first year of operation. Thereafter, if any of them are employed by the Company, their salaries shall be reasonable compensation, as determined by the Managers of the Company, and shall be F.H  B. H.

2

H. A.

payable in monthly installments during the term that each of such Investors is employed by the Company.

## ARTICLE III   CERTIFICATE FOR UNITS

SECTION 1. AUTHORIZED UNITS. The total number of units the Company is authorized to issue shall be limited to 20,000 units, to be issued as follows:

(a) To Fatollah Hematian, Behdad Hematian and Hertsel Akhavan,: One thousand units, divided among them or their assigns as they shall determine, fully paid and non assessable, at a price of $100 per unit. Payment for the units shall be made within thirty days after the formation of the Company.

(b) To Firooz Ghassabian: One thousand units, fully paid and non assessable, for which he shall assign to the Company the entire right, title and interest in and to the Invention described in the Agreement dated May 27, 1999, and in and to all patents and other proprietary rights therein or based thereon prior to the formation of the Company.

(c) Fatollah Hematian, Behdad Hematian and Hertsel Akhavan shall purchase additional units at the price of $100 per share, up to a maximum of nine thousand additional units, at such times, as shall be requested by Firooz Ghassabian. When such units are purchased by Fatollah Hematian, Behdad Hematian and Hertsel Akhavan, an equal number of units shall be issued to Firooz Ghassabian, at the price of $1 per unit.

(d) In the event that additional funds are necessary for the successful conduct of the Company's business, Fatollah Hematian, Behdad Hematian and Hertsel Akhavan, at their own discretion may lend such funds to the Company as they consider necessary, at the then prime rate posted by a bank selected by the Investors, for a term not to exceed three years.

(e) Additional units may be authorized and sold to such persons, at such prices and on such terms, as Fatollah Hematian, Firooz Ghassabian, Hertsal Akhavan and Feridoon Ghassabian shall mutually agree.

(f) Up to a maximum of ninety percent (90%) of Firooz Ghassabian's units may be issued to, or later transferred to, his wife, his son and his brothers, in accordance with his written instructions to the Company.

SECTION 2. FORM OF CERTIFICATES. Each owner of Units shall be entitled to one or more certificates, signed by the Manager of the Company, which shall certify the number of units or shares held by him or her in the Company. However, no certificate for units or shares shall be issued until they are fully paid.

SECTION 3. TRANSFER OF UNITS OR SHARES. Subject to the laws of the State of Delaware and the terms of this Agreement, Units of the Company shall be F. H  B. H 

3

transferable upon the books of the Company by the holders thereof, upon surrender and cancellation of certificates for a like number of Units, with duly executed assignment and power of transfer endorsed thereon or attached thereto, and with such proof of the authenticity of the signatures to such assignment and power of transfer as the Company or its agents may reasonably require. The transferee or assignee of any Member's interest shall have no right to participate in the management of the business and affairs of the Company or to become a Member unless the members, other than the transferring or assigning Members, unanimously approve, in writing, the transfer or assignment to the transferee or assignee, or as otherwise provided in the Agreement dated May 27, 1999, attached hereto.

SECTION 4. LOST, STOLEN OR DESTROYED CERTIFICATES. The Company may issue a new certificate for units or shares in place of any certificate previously issued by it and alleged to have been lost, stolen or destroyed. The Manager may, in his or her discretion, require the owner or the owner's legal representative to give the Company a bond containing such terms as the Manager may require to protect the Company or any person injured by the execution and delivery of a new certificate.

### ARTICLE IV  CAPITAL AND PROFITS AND LOSSES

SECTION 1. CAPITAL CONTRIBUTIONS. (a) Each Member's interest in the Company shall be equal to the number of Units owned by him, in proportion to the number of Units of the Company which are issued and outstanding from time to time.

(b) An individual capital account shall be established and maintained for each Member, which shall be credited with the amount of his capital contribution to the Company. A Member shall not be entitled to interest on his capital contribution, or to withdraw any part of his capital account, or to receive any distribution from the Company, except as specifically provided herein or by law.

SECTION 2. PROFITS AND LOSSES. a) The net profits and the net losses of the Company shall be shared by the Members in proportion to the number of Units each holds, compared to the total number of Units of the Company which are outstanding from time to time. The terms "net profits" and "net losses" shall mean, for each fiscal year or other period, an amount equal to the Company's net income or loss for such year or period, determined in accordance with the Internal Revenue Code of 1986 (the "Code"), as amended, as apply to partnerships.

b). Notwithstanding the foregoing, in order to comply with the requirements of the Internal Revenue Code and Regulations issued thereunder which require that the allocation of gains and losses reflect economic reality, $F.H$ $S.H.$



1) to the extent that allocation of losses will cause a Member's capital account to be negative, such losses shall be allocated and reallocated among the other Members pro-rata to their Units, and any amount of losses not so allocated because no Member has a positive Capital account, shall be divided among the Members in proportion their Units. In such event, the next available net profits shall thereafter be allocated to those Members who were charged with such losses because other Members did not have a positive capital account, in such sums as are required for them to recoup, as soon as possible, the amount of such non-proportional losses.

2) To the extent that gains are recognized for tax purposes on the sale of a depreciable asset, or because of distributions of sums borrowed on a non-recourse basis when that asset is used as collateral for the loan, the portion of the gain which is recognized, equal to depreciation deducted with respect to that asset, shall be allocated among the partners in proportion to the depreciation deduction previously charged to each, with respect to that asset.

3) In the event that cash distributions, not described above, results in a negative capital account for any member, the next available profits shall be allocated to that member pro-rata to other similarly situated members, in the sum required to offset the negative capital of the member.

4) If the foregoing provisions do not satisfy the tests of economic reality as promulgated from time to time in income tax regulations, this Agreement may be amended by majority vote of the members to the extent necessary to comply with such tests.

SECTION 3. CASH FLOW. The cash flow of the Company, for each fiscal year or other period shall be equal to the net profits or net losses of the Company for such year or period, determined in accordance with the rules and regulations of the Internal Revenue Code, as apply to partnerships, plus:

(A)    depreciation and other noncash charges deducted in determining such net profits or net losses;

(B)    the net cash proceeds resulting from any refinancing of Company property or the sale of any Company property received during such year or period,

and minus:

(C)    principal payments made during such year or period on Company loans;

(D)    any other cash expenditures made during such year or period which have not been deducted in determining the net profits or net losses of the Company for such year or period; and

(E)    any amount determined by the Members to be required to maintain sufficient working capital and/or a reserve for repairs and/or replacements. F. H. B. H.

M. A.

5

The cash flow of the Company shall be determined for each fiscal year and, as so determined, shall, in proportion to their respective Units of the Company, be distributed to the members as often as determined by the Managers.

SECTION 4. FISCAL YEAR. The fiscal year of the Company shall be the calendar year.

## ARTICLE V  RESTRICTIONS ON MEMBER'S TRANSFERABILITY

SECTION 1. NEW MEMBERS. A new Member may be admitted into the Company only if: (i) all the other Members approve of such admission; and (ii) said new Member executes such instruments as the other Members determine are necessary or desirable to effect such admission and to confirm the agreement of the person or entity being admitted to be bound by all of the covenants, terms and conditions of this Agreement then in effect. Such new Member's Units shall thereupon become voting Units.

SECTION 2. WITHDRAWAL FROM THE COMPANY. The Company shall have no obligation to purchase some or all of the Units held by a Member. No Member may partially or completely withdraw from the Company.

SECTION 3. RESTRICTIONS ON TRANSFER AND ENCUMBRANCE: RIGHT OF FIRST REFUSAL. (a) Other than units permitted to be sold hereunder, no units of the Company shall be sold to anyone without mutual agreement of Investors and Inventor.

(b) In the event that a unit holder wishes to sell or otherwise transfer units, other than to a member of his family, then upon receipt of a bona fide offer for such units, the unit holder shall offer such units at the bona fide offer price to the other unit holders. The other unit holders shall have 30 days to accept the offer and pay for the units, failing which the units may be sold within 30 days thereafter, pursuant to the terms of the bona fide offer.

(c) Except as otherwise stated above and in the Agreement dated May 27, 1999, each of the Members agrees that he or she will not, without the prior written consent of all Members, transfer, assign, sell, give, pledge, hypothecate or otherwise encumber his or her Units of interest in the Company ("Interest"), and any attempt to do any of the foregoing without such prior written consent shall be null and void and of no effect.

## ARTICLE VI  MEETINGS OF MEMBERS

SECTION 1. ANNUAL MEETING. The annual meeting of the Members of this limited liability company (the "Company") , for the purposes of electing a manager, considering proposals laid before such meeting, and transacting such other business as may properly be brought before such meeting, shall be held at the principal office of the F.H A.H.

M.A.

6

Company, or at or at such other place, either within or without the State of Delaware as may be designated by the Managers, and specified in the notice of such meeting.

Each such meeting shall be held on the last Tuesday of each January, if not a legal holiday, and, if a legal holiday, then on the next succeeding business day.

SECTION 2. SPECIAL MEETINGS. Special meetings of the Members of the Company may be held on any day, when called by the Managers, or when called by members who hold at least fifty percent (50%) of all Units outstanding and entitled to vote thereat. Upon request in writing delivered either in person or by certified mail, return receipt requested, by any voting Members entitled to call a meeting of Members, the Managers shall forthwith cause notice to be given to all owners of Units entitled to notice of the upcoming meeting. The meeting must be held on a date not less than ten (10), nor more than sixty (60), days after the receipt of such request, as the managers or members may fix. If notice is not given within twenty (20) days after the delivery or mailing of the request, the person or persons calling the meeting may fix the time of the meeting and give notice thereof in the manner provided by law or by this Operating Agreement, or may cause such notice to be given by any designated representative. Each special meeting shall be called to convene between 8:00 a.m. and 6:00 p.m., and shall be held at the principal office of the Company.

SECTION 3. NOTICE OF MEETINGS. Not less than ten (10), nor more than sixty (60), days before the date fixed for a meeting of members, written notice stating the time and place of the meeting (and, in the case of a special meeting, the purpose of such meeting) shall be given to each Unit owner entitled to vote thereat. Such meeting shall be held at such time and place as is specified in the notice thereof.

SECTION 4. QUORUM AND ADJOURNMENTS. Except as may be otherwise provided by law or by the articles of organization, the holders of a majority of the issued and outstanding voting Units of the Company shall constitute the quorum necessary for the meeting to occur.

ARTICLE VII  DISSOLUTION AND TERMINATION

SECTION 1. TERMINATION OF THE COMPANY. The Company shall be terminated and dissolved upon:

(A)    the vote of all Units in the Company;

(B)    the expiration of the term of the Company; or

(C)    the death, retirement, dissolution or resignation of a member, if the remaining Members do not vote to continue the business of the Company. F.H  B.H.

7

Upon the termination of the Company as herein provided, a full and general accounting shall be taken of the Company's business, and the affairs of the Company shall be wound up. Any net profits or net losses earned or incurred since the previous accounting shall be allocated among the Members pro rata to their Units. The Members shall wind up and liquidate the Company by selling the Company's assets and distributing the net proceeds therefrom, in cash, after the payment of all Company liabilities (including expenses and fees incurred in connection with the sale of assets and liquidation), to the members in proportion to the positive balances in their capital accounts.

SECTION 2. CONTINUING GOVERNANCE. In the event of a dissolution of the Company, the business affairs of the Company shall continue to be governed by the terms of this Agreement during the winding up of the Company's business and affairs.

### ARTICLE VIII. ARBITRATION OF DISPUTES.

All disputes regarding any matter related to any of the provisions of this Agreement, or the interpretation of any of its provisions, shall be resolved by arbitration. In all such cases the arbitrators shall be Abdolrahim Etessami, Abdolrahim Zar, and Nassim Bassalian, all residents of the State of New York. The arbitrators are authorized to retain legal counsel to assist them in such manner as they shall see fit. The fees and expenses of legal counsel shall be paid for by the Company.

### ARTICLE IX  AMENDMENTS

This Operating Agreement may be amended, or a new operating agreement may be adopted, by the affirmative vote of all of the Units.

IN WITNESS WHEREOF, the Members hereto have executed this Agreement this 27 day of May, 1999.

INITIAL MEMBERS:                                        # of Units

Fatollah Hematian: _____        _____

Firooz Ghassabian: _____        _____

Behdad Hematian _____        _____

Hertsel Akhavan _____        _____

8

## AGREEMENT

AGREEMENT made and effective as of this 27 day of May, 1999 by and between Fatollah Hematian, Behdad Hematian and Hertsel Akhavan, all individuals, residents of the State of New York, (the "Investors") and Firooz Ghassabian, an individual, residing at Tel Aviv, Israel, ("Inventor").

### W I T N E S S E T H

Whereas the Inventor has made and represents that he is the sole inventor of an invention relating to a wrist mounted telephone device and has been granted a patent relating thereto (copy attached as Exhibit "A") ("Invention"),

Whereas, the Inventor and the Investors desire to organize a limited liability company ("Company") to commercialize the Invention, and

Whereas the Inventor desires to contribute to the Company the Invention and all rights therein and the Investors desire to contribute to the Company cash for use as working capital.

Now, therefore, the parties agree as follows:

### 1. *Definitions.*

As used herein the term:

(a) "Invention" shall mean the invention and all patents owned by Inventor, relating to a wrist mounted telephone device, conceived by the Inventor prior to the date of incorporation of the Company, all improvements, enhancements and additions thereto and modifications and derivations thereof conceived or reduced to practice by Inventor prior to the incorporation of the Company, and all proprietary rights in or based on the foregoing; said invention being described in Exhibit A, attached hereto and made a part hereof.

(b) "Company" shall mean the limited liability company organized pursuant to this Agreement, including all subsidiaries thereof.

(c) "Organizers" shall mean collectively the Inventor and the Investors.

## 2. *Formation of limited liability company.*

The Organizers shall organize and form the Company pursuant to the laws of the State of Delaware under the name of "Classicom LLC.". Should such name be unavailable to the Company, an alternate name for the Company shall be mutually chosen by the Organizers.

## 3. *Articles of incorporation.*

The articles of organization or the operating agreement, as the case may be, of the Company shall include the following and such additional provisions as are consistent with the provisions of this Agreement:

      (a) The duration of the Company shall be ninety nine years.

      (b) The Company shall have at least three managers.

      (c) The total number of units the Company is authorized to issue shall be limited to 20,000 units.

      (d) The purposes of the Company shall include:

      (1) the development, commercialization, manufacture, and marketing of products and services based on the Invention or any improvements, enhancements or additions thereto or modifications or derivations thereof;

      (2) the filing, prosecution, holding, licensing and enforcement of patents based on the Invention or any improvements, enhancements or additions thereto or modifications or derivations thereof; and

      (3) the performing of other acts reasonably necessary for the profitable exploitation of the Invention or any improvements, enhancements or additions thereto or modifications or derivations thereof. *F. I+  F. GH. B.H  ʔR.A.*

### 4. *Distribution of units.*

Upon formation of the Company, the authorized units of the Company shall be issued as follows:

(a) To the Investors: One thousand units to the Investors, divided among them or their assigns as they shall determine, fully paid and non assessable, at a price of $100 per unit. Payment for the units shall be made within thirty days after the formation of the Company.

(b) To the Inventor: One thousand units to the Inventor, fully paid and non assessable, for which the Inventor shall assign to the Company the entire right, title and interest in and to the Invention and in and to all patents and other proprietary rights therein or based thereon prior to the formation of the Company.

(c) The Investors guarantee to purchase additional units at the price of $100 per share, up to a maximum of nine thousand additional units, at such times, as shall be requested by Inventor. When such units are purchased by the Investors, an equal number of units shall be issued to the Inventor, at the price of $1 per unit.

(d) In the event that additional funds are necessary for the successful conduct of the Company's business, the Investors at their own discretion may lend such funds to the Company as they consider necessary, at the then prime rate posted by a bank selected by the Investors, for a term not to exceed three years.

(e) Additional units may be authorized and sold to such persons, at such prices and on such terms, as Investors and Inventor shall mutually agree.

(f) Up to a maximum of ninety percent (90%) of Inventor's units may be issued to, or later transferred to, his wife, his son and his brothers, in accordance with Inventor's written instructions to the Company. *F H  F. G. B.H  M.A.*

3

## 5. *Structure of and employment by the corporation.*

The Organizers shall irrevocably vote their units to provide for the following during the first year following the incorporation of the Company:

(a) The managers of the Company shall be Fatollah Hamatian, Firooz Ghassabian, Hertsel Akhavan and Feridoon Ghassabian.

(b) The officers of the Company shall be:

| | |
|---|---|
| President | Firooz Ghassabian |
| Vice President | Fatollah Hamatian |
| Secretary | Yoram Ghassabian |
| Assistant Secretary | Hertsal Akhavan |
| Treasurer | Behdad Hamatian |

(c) Checks issued by the Company for less than $10,000, shall be signed by the President, signing alone. Any check issued by the Company for $10,000 or more, shall be signed by the President, and countersigned by either the Vice President or the Treasurer.

(d) The Inventor shall be Manager of Technical Development commencing June 1, 1999, and continuing for a period of two years, at an annual salary of $96,000 payable in equal monthly installments during the term of employment by the Company. The Inventor shall devote his entire time and efforts towards the commercialization of the Invention by the Company, including, the making of improvements, enhancements and additions to and modifications and derivations of the Invention. All improvements, enhancements and additions to and modifications and derivations of the Invention; all other inventions, conceived or reduced to practice during the term of employment of the Inventor by the Company and all other inventions related to the foregoing created during the period of one year after the termination of employment, including all proprietary rights therein or based thereon, shall be property of the Inventor, and shall forthwith be transferred by him to the Company, without charge to the Company.

(e) The Company will not pay salaries to the Investors for any services rendered to the Company during its first year of operation. Thereafter, if any of them are employed by the Company, their salaries shall be reasonable compensation, as determined by the *F.H* *F.G.* *B. H*

*H. A.*

4

Managers of the Company, and shall be payable in monthly installments during the term that each of such Investors is employed by the Company.

### 6. *Representations.*

The Inventor warrants and represents that he:

(a) Is the sole and exclusive owner of all right, title and interest in the Invention and all proprietary rights therein or based thereon.

(b) Has not granted any licenses or rights to third parties in the Invention or any proprietary rights therein or based thereon.

(c) Has disclosed the Invention or a portion thereof to to certain individuals, including Swatch, Ericsson, Timex, Nokia, Lucent, and Motorola, none of whom claimed that they had prior rights to the Invention.

(d) Is the sole and first inventor of the Invention.

(e) Knows of no statutory bars or prior art which would prevent the Invention from being the subject of one or more United States Letters Patent.

### 7. *Inventor's default.*

(a) Should the Inventor fail to assign to the Company the Invention and all proprietary rights therein or based thereon prior to the incorporation of the Company, this Agreement may be terminated and be deemed void *ab initio* or the Company may seek specific performance of the Inventor's obligations under this Agreement.

(b) In the event that the Inventor's rights in the Invention or proprietary rights therein or based thereon become the subject of litigation instituted by a third party claiming rights therein, the Investors shall nevertheless continue to provide funds to the Company as provided herein, up to a maximum of $1,000,000, and the Company shall defend against all such claims. F H FGH. B. H.    M. A.

(c) After the Investors have invested $1,000,000 in the Company as provided for herein, they shall have the option to either continue to provide additional funds to the Company in the manner provided for herein, or they may cause the Company to terminate its existence, in which event, the Invention and all proprietary rights therein or based thereon, and all improvements thereon, shall be returned to the Inventor.

### 8. *Investors' default.*

Should the Investors' subscriptions as required by Paragraphs 4(a) and 4(c) above, not be paid to the Company, then at the Inventor's sole option, he may require the Investors to transfer to him, at no cost, all of their units of the Company, or he may in the alternative require the Company to transfer to him, at no cost, all rights in and to the Invention and all proprietary rights thereto and all improvements thereon; and in either case, the Investors shall pay the Inventor the sum of $50,000.

### 9. *Legal services.*

All legal services, except patent registration and related issues, required in the organization of the Company and in the performance of the various provisions of this Agreement shall be performed by Jerome Kamerman, Esq., and his reasonable charges for all such services, plus all necessary disbursements incurred by him in the performance of such services, shall be paid by the Company.

### 10. *Assignment.*

This Agreement shall not be assignable by any of the Organizers without the prior written consent of the remaining Organizers. F H F.G/1. B.H. M.A.

6

### 11. *Ratification.*

Upon the formation of the Company, it shall, by resolution of its managers, ratify, adopt and become a party to this Agreement, and shall thereupon cause to be issued the units of the Company to each of the Organizers and to perform such other acts as may be required to effect the provisions of this Agreement.

### 12. *Restriction on Sale of Units, and Right of First Refusal.*

(a) Other than units permitted to be sold hereunder, no units of the Company shall be sold to anyone without mutual agreement of Investors and Inventor.

(b) In the event that a unit holder wishes to sell or otherwise transfer units, other than to a member of his family, then upon receipt of a bona fide offer for such units, the unit holder shall offer such units at the bona fide offer price to the other unit holders. The other unit holders shall have 30 days to accept the offer and pay for the units, failing which the units may be sold within 30 days thereafter, pursuant to the terms of the bona fide offer.

### 13. *Retention of Certain Units.*

Investors and Inventor shall, unless they mutually agree otherwise, each retain at least 10% of the units issued to them.

### 14. *Vote for Managers.*

The parties hereto shall vote their units at all elections of managers in favor of the election of Fatollah Hamatian and Firooz Ghassabian as managers.

### 15. *Arbitration of Disputes.*

All disputes regarding any matter related to any of the provisions of this Agreement, or the interpretation of any of its provisions, shall be resolved by arbitration. In all such cases

the arbitrators shall be Abdolrahim Etessami, Abdolrahim Zar, and Nassim Bassalian, all residents of the State of New York. The arbitrators are authorized to retain legal counsel to assist them in such manner as they shall see fit. The fees and expenses of legal counsel shall be paid for by the Company.

### 16. *Benefit.*

This Agreement shall be binding upon and inure to the benefit of each of the Organizers and their respective heirs and assigns.

In witness whereof each of the parties have caused this Agreement to be duly executed.

_____    _____
Fatollah Hematian               Firooz Ghabassian


_____    _____
Behdad Hematian                 Hertsel Akhavan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

FIROOZ GHASSABIAN,                              :

       Petitioner

                                              **PETITION TO STAY
                                              ARBITRATION AND FOR
                                              OTHER RELIEF**

      - against -                              :     Case No. 0̲8̲ ̲-̲ ̲c̲i̲v̲ ̲-̲ ̲4̲ ̲4̲0̲0̲

FATOLLAH HEMATIAN, BEHDAD               :
HEMATIAN, HERTSEL AKHAVAN, and
CLASSICOM, L.L.C., a limited liability company
Organized under the Laws of the State of Delaware
                                          :

       Respondents

IN THE MATTER OF THE ARBITRATION       :
BETWEEN
                                          :

FATOLLAH HEMATIAN
BEHDAD HEMATIAN                         :
HERTSEL AKHAVAN and
CLASSICOM L.L.C.,
                                          :

       Claimants

                                          :
*v.*

FIROOZ GHASSABIAN                       :

       Respondent.
                                        :
-------------------------------------------------------------------x

Petitioner Firooz Ghassabian (herein "Ghassabian" or "Petitioner"), by and through his

counsel, Zell Goldberg LLC and Jeffrey E. Michels, Esq., alleges as follows:

   1.   This is a Petition to Stay Arbitration and for Other Relief under the United

      Nations Convention on the Recognition and Enforcement of Foreign Arbitral

Awards of June 10, 1958 (the "New York Convention") as implemented by 9

U.S.C.§201 *et seq.* (2007)[the "Convention Act"] and specifically under 9 U.S.C.

§206 and 9 U.S.C. §4 (the "Federal Arbitration Act").

2.  Petitioner seeks an order staying the pending arbitration proceedings commenced

by the Respondents-Claimants as described below (herein the "Arbitration") due

to the death of one of the members of the arbitral panel and the irremediable

conflict of interest that taints the remaining arbitrators.  Under these

circumstances Petitioner also seeks an order declaring the parties' dispute to be

non-arbitrable due to the inability of the designated arbitral panel to serve.

Alternatively, in the event that the Court determines that the underlying dispute is

arbitrable, the Court is asked to appoint a panel of three neutral arbitrators or, in

the event the Court determines to only to replace the deceased arbitrator, then to

appoint a neutral third arbitrator and require any decision or award to be approved

by a unanimous vote of the arbitral panel.

3.  The factual allegations set forth in this Petition are supported by the declaration of

Petitioner Ghassabian and affidavit of his brother Fereidoon Ghassabian, attached

hereto respectively as <u>Petitioner's Declaration</u> [Pet. Decl.], <u>Exhibit 1</u> and

<u>Fereidoon's Ghassabian's Affidavit</u> [Fereidoon Aff.], <u>Exhibit 2</u> and made a part

hereof.

<div align="center">

PARTIES
</div>

4.  Petitioner Ghassabian is an individual, currently residing in and is a citizen of the

State of Israel.  He has been resident in the State of Israel since 1997.  Prior to his

emigration to the State of Israel in 1997, Petitioner was a resident and citizen of

the Republic of France for approximately 17 years. Petitioner is not and has never been a citizen or a permanent resident of the United States or any State thereof, including especially, the State of New York.

5.  Respondent Fatollah Hematian is an individual naturalized citizen and resident of the United States of America and the State of New York, maintaining his permanent residence at 11 Locust Cove Lane in the Village of Great Neck, Town of North Hempstead, Nassau County, New York. On information and belief Respondent Fatollah Hematian is an employee and/or principal of BH Multi Com Corporation located at 15 West 46th Street, Sixth Floor, New York, New York 10036.

6.  Respondent Behdad Hematian is an individual naturalized citizen and resident of the United States of America and the State of New York, maintaining his permanent residence at 29 Carriage Road, Village of Great Neck, Town of North Hempstead, Nassau County, New York. Respondent Behdad Hematian is the son of Respondent Fatollah Hematian. On information and belief Respondent Behdad Hematian is an employee and/or principal of BH Multi Com Corporation located at 15 West 46th Street, Sixth Floor, New York, New York 10036.

7.  Respondent Hertsel Akhavan is an individual naturalized citizen and resident of the United States of America and the State of New York, maintaining his permanent residence at the Village of Great Neck, Town of North Hempstead, Nassau County, New York. On information and belief Respondent Hertsel Akhavan is an employee and/or principal of BH Multi Com Corporation located at 15 West 46th Street, Sixth Floor, New York, New York 10036.

3

8. Respondent Classicom L.L.C. (herein "Classicom") is a limited liability company organized and existing under the laws of the State of Delaware, and therefore a citizen of the United States and the State of Delaware, having a principal place of business at 11 Locust Cove Lane, Village of Great Neck, Town of North Hempstead, Nassau County, New York and at 15 West 46th Street, Sixth Floor, New York, New York County, New York 10036. Respondent Classicom is not registered or qualified in the State of New York as a foreign limited liability company. Respondent Classicom was formed for the specific purpose of engaging in the business of developing and commercially exploiting certain technology conceived and reduced to practice by Petitioner Ghassabian as further alleged below.

9. Petitioner Ghassabian and Respondents Fatollah Hematian, Behdad Hematian and Hertsel Akhavan are all members and officers of Respondent Classicom.

10. This Court has subject matter jurisdiction over the present action pursuant to 9 U.S.C. §201 *et seq.*, which implements for purposes of United States law the provisions of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958), ratified by the United States on September 30, 1970, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "New York Convention") in that the Petitioner and Respondents, being respectively citizens of Israel and the United States of America, entered into commercial agreements each of which contains an Arbitration Clause (as more definitively described below). As a consequence the Arbitration Clause "falls under" the New York Convention, 9 U.S.C.§202, and this proceeding is deemed to "arise under

4

the laws and treaties of the United States," 9 U.S.C.§203, with the result that this Court has original jurisdiction with respect thereto, regardless of the amount in controversy. *Id. and* 28 U.S.C.§ 1331 ("[t]he district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States.")

11. This Court has personal jurisdiction over the individual Respondents on the grounds that that pursuant to the Agreements, Respondents have agreed to arbitrate their disputes with Petitioner in the State of New York and over each and all of the Respondents because all of the Respondents have in fact commenced arbitration against Petitioner in the State of New York, as further alleged below.

12. Venue is properly laid in this District pursuant to 9 U.S.C.§204 in that by necessary implication the State of New York was intended by the Parties to the Arbitration Clause to be the situs of the arbitration inasmuch as each of the individually designated arbitrators (herein the "Arbitrators") were stated to be "residents of the State of New York."  In addition, Respondents have waived all objections to venue and have consented to venue in this District by virtue of having commenced the Arbitration in the State of New York and in this District. Furthermore,  venue properly lies in this District for the reason that any action or proceeding regarding the controversy between the Parties could be brought in this District because while the individual Respondents reside outside the District (even though all of them are regularly employed in this District on information and belief), Respondent Classicom is subject to personal jurisdiction in this District and therefore is deemed to reside in this District with result that all Respondents

are subject to suit in this District under 28 U.S.C.§1391(b)(1), 28 U.S.C.§1391(c) and  9 U.S.C.§204.

## FACTS

*The Enterprise Agreement and the Operating Agreement*

13.    On or about May 27, 1999, Petitioner Ghassabian and Respondents Fatollah Hematian, Behdad Hematian and Hertsel Akhavan entered into an agreement entitled simply "Agreement" (herein the "Enterprise Agreement").

14.    The Enterprise Agreement sets forth the terms for commercializing an invention which was created by Petitioner Ghassabian, namely, a wrist-mounted telephone (the "Invention").

15.    To facilitate commercialization of the Invention, the Enterprise Agreement provided for the creation of a limited liability company under Delaware law to be known as "Classicom LLC" (herein sometimes referred to as the "LLC") which when eventually formed became the Respondent Classicom in these proceedings.

16.    Under the terms of the Enterprise Agreement, the LLC was to be owned 50% by Petitioner Ghassabian and 50% by Respondents Fatollah Hematian, Behdad Hematian and Hertsel Akhavan.    In consideration for his share of the LLC, Petitioner was required to transfer to the LLC the Invention and certain other technology.

17.    In consideration for their membership interests in the LLC, the individual Respondents were to provide funding to the LLC as a capital contribution.

18. The Enterprise Agreement was drafted by counsel for Respondents. Petitioner was not represented by counsel. A copy of the Enterprise Agreement is attached to Petitioner's Declaration as **Exhibit A**.

19. Contemporaneously with the execution of the Enterprise Agreement, Petitioner and the individual A copy of the Operating Agreement is attached to Petitioner's Declaration as **Exhibit B**.

20. Under Section 5(d) of the Enterprise Agreement, Petitioner Ghassabian was to be "Manager of Technical Development for a two-year term, commencing June 1, 1999, at an annual salary of $96,000 payable in equal monthly installments during the term of employment by [the LLC].".

21. The individual Respondents initially deposited approximately $120,000 into a bank account set up in the name of the LLC which was used to pay both Petitioner's salary and other expenses. During the first six to seven months following the execution of the Enterprise Agreement and the Operating Agreement, Petitioner was paid between $50,000 and $60,000 in salary drawn from the LLC bank account. Thereafter Respondents refused to deposit any additional funds into the LLC account and also refused to pay Petitioner's monthly salary from any other source in direct contravention of the Enterprise Agreement. As of the date of the commencement of these proceedings, Petitioner has not received any additional salary payment, with the result that he has been paid only between $50,000 and $60,000 out of the total $192,000 to which he was entitled to receive as salary between June 1999 and May 2001 pursuant to the Enterprise Agreement and Operating Agreement and in direct breach thereof.

*The Arbitration Clause and the Arbitral Panel*

22.    Both the Enterprise Agreement and the Operating Agreement contain the

following broad, non-standard arbitration provision (the "Arbitration Clause"):

> **15.    *Arbitration of Disputes.***
>
> All disputes regarding any matter related to any of the provisions
> of this Agreement, or the interpretation of any of its provisions,
> shall be resolved by arbitration.  In all such cases the arbitrators
> shall be Abdolrahim Etessami, Abdolrahim Zar, and Nassim
> Bassalian, all residents of the State of New York.  The arbitrators
> are authorized to retain legal counsel to assist them in such manner
> as they shall see fit.  The fees and expenses of legal counsel shall
> be paid for by the Company.

23.    As explained in Petitioner's Declaration, during the negotiation of the Agreement

and Operating Agreement, the scope and structure of the Arbitration Clause was

specifically discussed.  Petitioner agreed to include the Arbitration Clause on the

express understanding that any disputes between the Respondents and himself

would be resolved by arbitration (as opposed to going to judicial litigation)

provided that such disputes would be heard and decided unanimously by a panel

of three (3) arbitrators and that these three arbitrators would be identified in

advance in the Agreements.  Petitioner's consent to arbitration was further

specifically conditioned upon the appointment of Messrs. Abdolrahim Etessami,

Abdolrahim Zar, and Nassim Bassalian as the sole and exclusive members of the

arbitral panel.  Petitioner, who then and at all times herein material resided in

Israel and not in the United States, knew of these three individuals as leaders of

the Meshadi Jewish community in New York.  Being a member of the Meshadi

Jewish community in Israel having been born into that community in Iran,

Petitioner was aware of the reputation of the suggested Arbitrators all of whom were originally from the Meshadi Jewish community in Iran.

24.    Petitioner would never have agreed to resolve disputes between the individual Respondents and himself by arbitration if these three individuals were not expressly designated as the arbitrators or if any of them could not serve as an arbitrator.

25.    On information and belief, it was also the intention of the individual Respondents that Abdolrahim Etessami, Abdolrahim Zar, and Nassim Bassalian be specifically designated as the sole arbitrators under the Arbitration Clause.

26.    On information and belief, the suggested Arbitrators, Abdolrahim Etessami, Abdolrahim Zar and Nassim Bassalian, were never notified that they had been designated in the Enterprise Agreement and Operating Agreement as arbitrators until the Respondents submitted their initial demand for arbitration in January 2008 as further described below.

*Death of Panel Member*

27.    On information and belief, in or around 2004, Mr. Abdolrahim Zar, one of the arbitrators designated in the Arbitration Clause died.  It was Petitioner's specific intention at the time he entered into the Enterprise Agreement and Operating Agreement that Abdolrahim Zar serve as one of the three arbitrators to hear any disputes between the Respondents and himself.  It was never Petitioner's intention that any disputes between Respondents and himself be heard by an arbitration panel consisting solely of Abdolrahim Etessami and Nassim Bassalian without the presence of Abdolrahim Zar.  Petitioner would never have agreed to arbitrate

9

disputes between Respondents and himself if Abdolrahim Zar were not available to participate as an arbitrator.

*The Arbitration Proceeding*

28. Following the execution of the Enterprise Agreement and Operating Agreement, a series of disputes arose between Petitioner and the Respondents concerning the implementation of those Agreements.   As alleged above, Respondents failed to pay Petitioner the salary to which he was entitled, failed to finance the operations of the LLC as they had undertaken and otherwise failed to manage the affairs of the LLC competently.

29. Respondents took the first step to resolve these disputes by attempting to commence arbitration proceedings by mailing, through counsel, a demand for arbitration dated January 10, 2008.  For various reasons not germane here this initial demand for arbitration was defective under the New York arbitration law, CPLR §7501 *et seq.*,  and as a consequence of these defects and attempted settlement negotiations, was later frozen and then abandoned by the Respondents before Petitioner submitted any response and before any formal adversarial hearing was convened.

30. Seeking to rectify the defects in the January 10, 2008 demand for arbitration, Respondents resubmitted a written Demand for Arbitration, through counsel, a copy of which was received by Petitioner in Israel on April 17, 2008 (the "Demand for Arbitration").  Respondents alleged in the Demand for Arbitration that Petitioner failed to comply with the terms of the Enterprise Agreement and the Operating Agreement, stating *inter alia:*

> Ghassabian's failure to comply with the terms of the Agreement and Operating Agreement by failing to assign all right, title and interest in and to Ghassabian's Invention, as that term is defined in the Agreement, and any improvements, enhancements, additions, modification or derivations thereof, and all patents and other proprietary rights related thereto, to Company as required under the terms of the Agreement and the Operating Agreement. Specific performance of agreement relating to the sale of three (3) 1% equity interests in the Company's equity and such other claims and issues between the Parties.

A copy of the Demand for Arbitration is attached to Petitioner's Declaration as

**Exhibit C.**

31. In their Demand for Arbitration Respondents designated only two of the original three arbitrators as the arbitral panel, namely: Abdolrahim Etessami and Nassim Bassalian. As noted above, the third member of the original arbitral panel was deceased at the time the Demand for Arbitration was filed.

*Respondents' Improper Contacts and Communications with Arbitrators Etessami and Bassalian*

32. Since the filing of the aborted initial demand for arbitration, one or more of individual Respondents was in contact and had discussions with designated arbitrators, Messrs. Etessami and Bassalian in connection with the underlying disputes between Respondents and Petitioner. These contacts and discussions took place without Petitioner being present or represented and without Petitioner's knowledge or consent.

33. On information and belief, Respondents discussed with Mr. Etessami and Mr. Bassalian in detail Respondents' substantive positions concerning the disputes to such an extent that Petitioner was invited to meet with the two designated arbitrators in order to give his account of the dispute, inasmuch as the arbitrators were already familiar with the Respondents' position!

34.    Further details of the improper *ex parte* contacts and communications between Respondents and the designated arbitrators, Messrs. Etessami and Bassalian, are set forth in the Petitioner's Declaration and in the Affidavit of Fereidoon Ghassabian and are incorporated by reference herein.

35.    In addition to the foregoing, based on information and belief Respondent Fatollah Hematian has been a close personal friend of both Mr. Etessami and Mr. Bassalian from the early 1980s through the present.  During the time of the negotiations of the Enterprise Agreement and Operating Agreement in May 1999 Respondent Fatollah Hematian did not disclose to Petitioner nor was Petitioner aware of Respondent's close personal relationship with designated arbitrators.

36.    Considering (i) the long term, undisclosed intimate relationship between Respondent Fatollah Hematian and designated arbitrators, Messrs. Etessami and Bassalian; and (ii) the contacts and communications by Respondents with designated arbitrators, Messrs. Etessami and Bassalian, as well as substantive comments by the designated arbitrators themselves, concerning the substantive aspects of the underlying disputes between Respondents and Petitioner, which took place without Petitioner's presence, consent or knowledge, the designated arbitrators, Etessami and Bassalian, have been irremediably biased and tainted and cannot possibly act as fair and impartial arbitrators in relation to the disputes between Respondents and Petitioner.

37.    For the reasons set forth above, the arbitration proceedings commenced by Respondents' Demand for Arbitration received on April 17, 2008 are procedurally flawed and will inexorably result in palpable and substantial harm and prejudice

to the Petitioner if allowed to proceed in that the designated arbitral panel is defective for lack of a third arbitrator (specifically Abdolrahim Zar) as required by the Arbitration Clause

38. As alleged above and set forth in the accompanying Declaration of Petitioner and Affidavit of Fereidoon Ghassabian, the designated arbitrators have been compromised and are subject to irreconcilable conflicts of interest and bias in favor of some or all of the Respondents having engaged in numerous and improper substantive *ex parte* communications and contacts with some or all of the Respondents, thereby precluding the designated arbitrators from exercising impartial and unbiased judgment in any adjudicating the disputes pending among the parties thereto. Consequently, the designated arbitrators are not competent to adjudicate the present disputes and must be disqualified.

39. As a result of the death of one member of the panel of arbitrators designated by the Parties in the Arbitration Clause and the disqualification of the remaining designated arbitrators, none of the three arbitrators specially designated by Petitioner and the individual Respondents in the Arbitration Clause is able or qualified to arbitrate the pending disputes and because the participation of all three of the designated arbitrators was a fundamental condition precedent to the consent of the Petitioner to arbitrate controversies arising under the Enterprise Agreement and Operating Agreement, the implementation of the Arbitration Clause has been rendered impossible or impracticable.

40. Prompt intervention by this Court is essential in order to prevent Respondents from proceeding with the Pending Arbitration with the currently designated

arbitral panel which will result in immediate, substantial and palpable prejudice to the rights of the Petitioner both under the Arbitration Clause, the New York Convention and the Federal Arbitration Act.

*The Arbitration is Barred by Limitations*

41.    Because the Demand for Arbitration was filed more than six (6) years after the time in which the subject technology was conceived or reduced to practice, Respondents claims and hence the Pending Arbitration are barred by the statute of limitations.  CPLR §213(2).

<div align="center">RELIEF REQUESTED</div>

42.    In view of the foregoing and considering the attached Declaration, Affidavit and the documents appended thereto and in light of the authorities set forth in the accompanying Memorandum of Law in Support of Petition to Stay Arbitration and for Other Relief, the Court is requested to grant the following relief:

    a.    Issue an order immediately staying the Pending Arbitration or in the alternative issue a preliminary injunction prohibiting the Respondents from proceeding with the Pending Arbitration until and unless otherwise directed by this Court;

    b.    Issue an order finding that the surviving designated arbitrators, Messrs. Etessami and Bassalian, are disqualified from serving as members of the arbitral panel in the Pending Arbitration due to their conflict of interests and/or bias or the appearance of same.

    c.    In the event the Court determines that as a result of the (i) death Abdolrahim Zar; or (ii) the death of Abdolrahim Zar and the disqualification of Messrs.

<div align="center">14</div>

Etessami and Bassalian and the intention of the Parties in designated these

specific persons to serve as arbitrators of any disputes or controversies arising

under the Arbitration Clause, issue an order declaring the Arbitration Clause

to be unenforceable and releasing the Parties from any obligation to arbitrate

their disputes thereunder;

d.  In the alternative, in the event the Court elects not to declare the Arbitration

Clause to be unenforceable under the circumstances of this case, issue an

order appointing a panel of three neutral arbitrators who are members of the

Bar of New York City or any other jurisdiction the Court determines to be

appropriate under the circumstances; or

e.  In the alternative, in the event the Court elects not to disqualify the designated

arbitrators, Messrs. Etessami and Bassalian, to issue an order appointing a

neutral third party to fill the position of the deceased arbitrator, Zar, with

instructions that any decision or award of the arbitral panel so reconstituted

shall be made by unanimous vote of the entire three-member panel.

f.  For such other and further legal and equitable relief as the Court in its

discretion shall deem appropriate.

May 6, 2008

JEFFREY E. MICHELS, ESQ.
JM 2255
Zell Goldberg LLC
*Attorneys for Petitioner Firooz Ghassabian*
350 Fifth Avenue, Suite 3304
New York, New York 10118-0069
Telephone: (212) 971-1349
Facsimile: (212) 253-4030

L. MARC ZELL, ESQ.
*of Counsel for Petitioner Firooz Ghassabian*

ECF

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:08-cv-04400-SAS

| | |
|---|---|
| Ghassabian v. Hematian et al | Date Filed: 05/09/2008 |
| Assigned to: Judge Shira A. Scheindlin | Jury Demand: None |
| Cause: 09:201 Arbitration | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Federal Question |

**Petitioner**

**Firooz Ghassabian**                    represented by   **Jeffrey E. Michels**
Zell Goldberg LLC
350 Fifth Avenue Suite 3304
New York, NY 10118
(212)-971-1349
Fax: (212)-253-4030
Email: jmichels@fandz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Fatollah Hematian**

**Respondent**

**Behdad Hematian**

**Respondent**

**Hertsel Akhavan**

**Respondent**

**Classicom, L.L.C.**
*a limited liability company Organized
under the Laws of the State of Delaware*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/09/2008 | 1 | PETITION TO STAY ARBITRATION. (Filing Fee $ 350.00, Receipt Number 650278).Document filed by Firooz Ghassabian.(cd) (Entered: 05/13/2008) |
| 05/09/2008 | | SUMMONS ISSUED as to Fatollah Hematian, Behdad Hematian, Hertsel Akhavan, Classicom, L.L.C.. (cd) (Entered: 05/13/2008) |

| 05/09/2008 | | Magistrate Judge Andrew J. Peck is so designated. (cd) (Entered: 05/13/2008) |
|---|---|---|
| 05/09/2008 | | Case Designated ECF. (cd) (Entered: 05/13/2008) |
| 05/13/2008 | 2 | FIRST MEMORANDUM OF LAW in Support re: 1 Petition to Compel/Confirm/Modify/Stay/Vacate Arbitration *and for Other Relief*. Document filed by Firooz Ghassabian. (Michels, Jeffrey) (Entered: 05/13/2008) |
| 05/22/2008 | 3 | AFFIDAVIT OF SERVICE of Petition and Memorandum of Law served on Behdad Hematian and Hertsel Akavian on May 13, 2008. Service was accepted by Behdad Hematian and Hertsel Akavian. Document filed by Firooz Ghassabian. (Michels, Jeffrey) (Entered: 05/22/2008) |
| 05/22/2008 | 4 | AFFIDAVIT OF SERVICE of Petition and Memorandum of Law served on Fatollah Hematian on May 16, 2008. Service was accepted by Melissa Campee, Secretary/Receptionist. Document filed by Firooz Ghassabian. (Michels, Jeffrey) (Entered: 05/22/2008) |
| 05/22/2008 | 5 | AFFIDAVIT OF SERVICE of Petition and Memorandum of Law served on Classicom LLC on May 16, 2008. Service was accepted by Melissa Campee, Secretary/Receptionist. Document filed by Firooz Ghassabian. (Michels, Jeffrey) (Entered: 05/22/2008) |
| 05/22/2008 | 6 | AFFIDAVIT OF SERVICE of Petition and Memorandum of Law served on Classicom LLC on May 21, 2008. Service was made by Mail. Document filed by Firooz Ghassabian. (Michels, Jeffrey) (Entered: 05/22/2008) |
| 05/22/2008 | 7 | AFFIDAVIT OF SERVICE of Petition and Memorandum of Law served on Fatollah Hematian on May 21, 2008. Service was made by Mail. Document filed by Firooz Ghassabian. (Michels, Jeffrey) (Entered: 05/22/2008) |
| 06/03/2008 | 8 | STIPULATION: It is hereby stipulated and agreed that Respondents Fatollah Hematian, Behdad Hematian, Hertsel Akhavan, and Classicom L.L.C. shall have up to and including June 19, 2008 in which to move, answer or otherwise respond to Petitioner's Petition in this action. this Stipulation may be executed in more than one counterpart, all of which when taken together shall constitute one and the same Stipulation. (Signed by Judge Shira A. Scheindlin on 6/3/2008) (jfe) (Entered: 06/03/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/18/2008 16:33:46 | | | |
| **PACER Login:** | ks1008 | **Client Code:** | Optional for PACER use only |
| **Description:** | Docket Report | **Search Criteria:** | 1:08-cv-04400-SAS |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

23/08                              23/08

## AUTHENTICATION OF SIGNATURE

<div dir="rtl">

## אימות - חתימה

</div>

I the undersigned, Yoel Rippel, notary at Menahem Begin 7 Ramat-Gan, Israel, hereby certify that on 7 May 2008 there appeared before me at my office at Menahem Begin 7 Ramat Ms. Nili Harish, whose identity was proved to me by Israeli passport No: 9265922, issued by ministry of interior at Herzelya on 22.01.2002 and signed of her own free will the attached document marked "A" + "A"-1.

In witness whereof I hereby authenticate the signature of Ms. Nili Harish by my own signature and seal this .15/5/2008.

<div dir="rtl">

אני החי"מ יואל ריפל, עו"ד ונוטריון מרח' מנחם בגין 7 רמת גן, מאשר כי ביום 7.5.08 ניצבה לפני במשרדי מרח' מנחם בגין 7 רמת גן, גב' נילי חריש שזהותה הוכחה לי על פי דרכון ישראלי מספר 9265922 שהוצא על ידי משרד הפנים בהרצליה ביום 22/1/2002 וחתמה מרצונה החופשי על המסמך המצורף והמסומן באות א' + א'-1 שמעבר לדף.

ולראיה אני מאמת את חתימתה של גב' נילי חריש בחתימת ידי ובחותמי, היום 15.5.08

</div>



**SIGNATURE     NOTARY SEAL**

<div dir="rtl">
חותם נוטריון     חתימה נוטריון
</div>

<div dir="rtl">
נדרש שכר טרחת נוטריון: 423 ₪ (כולל מע"מ
</div>

# APOSTILLE

(Convention de la Haye du 5 Octobre 1961)

1. **STATE OF ISRAEL**
   This public document

2. Has been signed by
   Advocate _____ Y. Zippel

3. acting in capacity of Notary.

4. bears the seal/stamp of
   the above Notary
   **Certified**

5. at the Magistrates' Court, Tel Aviv-Jaffa

6. Date _____    15. 05. 2008

7. by an official appointed by
   Minister of Justice under the
   Notaries Law, 1976.

8. Serial number _300960_

9. Seal/Stamp _____

10. Signature _____

מדינת ישראל .1
מסמך ציבורי זה

נחתם בידי .2
עו״ד _____

המכהן בתור נוטריון. .3

נושא את החותם/החותמת .4
של הנוטריון הנ״ל
אושר

בבית משפט השלום תל אביב-יפו .5

ביום. .6

על ידי מי שמונה בידי שר .7
המשפטים לפי חוק הנוטריונים,
התשל״ו-1976.

מס׳ סידורי .8

החותם/בחותמת .9

חתימה .10

CITY OF
COUNTY

## AFFIDAVIT OF SERVICE

CITY OF TEL AVIV       )
                       ) ss.:
COUNTRY OF ISRAEL   )

      Nili Harish, Israeli passport 9265922, being duly sworn, deposes and says:

1. That I am over eighteen years of age and am not a party to the above-entitled action.

2. That on the 17th day of April, 2008, at 3:15 P.M., I served a copy of the Demand for Arbitration annexed hereto upon Firooz Ghassabian, the party named therein, in the manner prescribed by Israeli law.

3. That such service was made by delivering a copy of the Demand for Arbitration to Mrs. Firooz Ghassabian (Jacqueline), at 3:15 P.M. on the 17th day of April, 2008 at 13/29 Kashani Street, Tel Aviv, Israel, Mr. Ghassabian's usual place of abode.

4. That the person served identified herself as Mr. Firooz Ghassabian's wife and acknowledged receipt of the Demand for Arbitration by signing the attached Certificate of Service, marked A-1.

Sworn to before me this
7 day of May, 2008

_____
Notary Public

## Certificate of service

*Jacqueline*

I the undersigned, Mr. ~~Firooz~~ Ghassabian, hereby confirm that I received the demand for arbitration from Fatollah Hematian, Behadad Hematian, Hertzel Akhavan and Classicom L.L.C.

Today the 17 of April 2008                                   Signature

☑ I the undersigned, Nili Harish, ID 038184206, hereby certify that on april 17 2008 I delivered the demand of arbitration to Mrs. Firooz Ghassabian, *Jacqueline* of 13/29 Kashani st. Tel-Aviv.

☐ Mr. Firooz Ghassabian refused to acknowledge receipt of the above document.

Signature



DEMAND FOR ARBITRATION

Mr. Firooz Ghassabian
13/29 Kashani Street
69499 Tel Aviv
Israel

The Claimants named herein, pursuant to the (i) Section 15 of that certain agreement dated May
27, 1999 ("Agreement") entered into between, Fatollah Hematian, Behdad Hematian, Hertsel
Akhavan ("Claimants") and Firooz Ghassabian ("Ghassabian") (collectively the "Parties"), and
(ii) Article VIII of the Parties' Classicom L.L.C. ("Company") Operating Agreement dated as of
May 27, 1999 ("Operating Agreement"), copies of which are attached hereto, hereby demands
arbitration of the following controversies, which is subject to arbitration under the
aforementioned agreements:

> Ghassabian's failure to comply with the terms of the Agreement and Operating
> Agreement by failing to assign all right, title and interest in and to Ghassabian's
> Invention, as that term is defined in the Agreement, and any improvements,
> enhancements, additions, modification or derivations thereof, and all patents and other
> proprietary rights related thereto, to Company, as required under the terms of the
> Agreement and the Operating Agreement,

> Specific performance of agreement relating to the sale of three (3) 1% equity interests in
> the Company's equity, and

> such other claims and issues between the Parties.

Pursuant to the Agreement and Operating Agreement the arbitrators designated by the Parties
are:

Mr. Abdolrahim Etessami
2 Sterling Road
Kings Point, New York  11024

Mr. Nassim Bassalian
12 Bernard Street
Great Neck, New York  11023


Please take further notice that, unless within twenty (20) days after service of this notice, you
apply, pursuant to N.Y. C.P.L.R. 7503(c), for a stay of the arbitration, you will thereafter be
precluded from objecting that a valid agreement was not made or has not been complied with and
from asserting in court the bar of a limitation of time.

<u>Claimants:</u>

Fatollah Hematian
c/o BH Multi Com Corp.
15 West 46th Street, 6th Floor
New York, New York  10036

Behdad Hematian
c/o BH Multi Com Corp.
15 West 46th Street, 6th Floor
New York, New York  10036

Hertsel Akhavan
c/o BH Multi Com Corp.
15 West 46th Street, 6th Floor
New York, New York  10036

Classicom L.L.C.
11 Locust Cove Lane
Great Neck, New York  11024
Attn:  Fatollah Hematian


Dated:  April 3, 2008


Hilton Soniker, Esq.
Kamerman & Soniker P.C.
Attorneys for Claimants
470 Park Avenue South, 12th Floor South
New York, NY 10016
212-400-4930